Andrew VARGA, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C79–309.

United States District Court, N.D. Ohio, E.D.

March 25, 1983.

Scott E. Stewart, Stewart & DeChant, Cleveland, Ohio, for plaintiff.

Patrick M. McLaughlin and Randolph Baxter, Asst. U.S. Attys., Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Andrew Varga sues the United States of America for damages by reason of a swine flu immunization he received on October 31, 1976. Plaintiff Varga claims that the swine flu immunization caused him to contract Guillain-Barre syndrome on February 16–17, 1977.

Plaintiff Varga's case is one of the personal injury and wrongful death actions with a genesis in the National Influenza Immunization Program of 1976. These actions were consolidated by the Multi-District Litigation Panel and assigned for pre-trial purposes to Judge Gerhard Gesell of the United States District Court for the District of Columbia.

The National Influenza Immunization Program of 1976 is codified under the National Swine Flu Immunization Program Act (42 U.S.C. § 247b as amended by Public Law 94–380 to include subsections (a) through (1)). Andrew Varga and presumably all of the swine flu vaccine product liability claimants rely on 42 U.S.C. § 247b(k)(2)(A). This subsection provides that the United States shall be liable with respect to claims submitted after September 30, 1976,

> for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or omission of a program participant [defined in subsection (2)(B)] in the same manner and to the same extent as the United States would be liable in any other action brought against it under [28 U.S.C. § 1346(b)] and Chapter 171 of such table [except as set forth thereafter in 2(A)(i), (ii), and (iii)].

Plaintiff states and defendant United States of America admits that he filed an administrative claim with the U.S. Department of Health, Education and Welfare pursuant to the Federal Tort Claims Act, 28 U.S.C. 2671, *et seq.* The government denied the claim on January 31, 1979. Pursuant to 28 U.S.C. § 1346, plaintiff filed this action.

In its trial brief the defendant United States of America (hereafter United States, government, or defendant) states:

> Aside from the issue of damages, the single issue presented in this litigation is whether Andrew Varga's Guillain-Barre syndrome was caused by administration of a swine flu inoculation received on October 31, 1976.

Plaintiff agrees that in this bifurcated trial, the sole liability issue is whether the swine flu inoculation (vaccination) Andrew Varga received on October 31, 1976 caused him to contract Guillain-Barre syndrome on or about February 16 or 17, 1977.

### I.

Andrew Varga, born July 30, 1921, was 55 years old when he received his swine flu vaccination at the McCafferty Health Clinic in Cleveland, Ohio on October 31, 1976. He testified that the first illness he experienced after receiving the swine flu shot occurred on about December 15, 1976. He said the only way that he could describe it was that it was a cold accompanied by a severe cough. He said he had "pains in both legs of unknown origin." The cold lasted about three days. He did not have a fever.

Another cold started a week before February 16, as he put it. At the beginning there was a severe cough, a slight fever, and congestion in his chest that continued through the weekend. He was in bed from Friday evening until Monday morning. Although he felt better on Tuesday, on Wednesday, February 16, he felt a slight tingling in the tips of his toes.

Between February 16 and February 28 the tingling, combined with numbness, traveled upward bilaterally.[1] Also, "a weakness settled in with a heavy feeling."

By February 23 he could not get out of bed. On February 24 he noticed that the

---

1. According to the Lutheran Hospital record, the tingling sensation was first experienced on February 17. It started first in his fingers and toes, and gradually spread to involve the hand and foot on both sides.

right side of his face was misshapen and paralyzed. He could not close his right eye. His speech was slurred. He could not eat or drink. His doctor, who had earlier prescribed vitamins, made a house call and prescribed cortisone.

With his legs completely paralyzed, he consulted a second doctor. After examination the doctor arranged for the immediate transfer of Mr. Varga to Lutheran Medical Center. He remained there until March 16 when he was transferred to Highland View Hospital for rehabilitation. At Lutheran Medical Center, Dr. Nakhle called in Dr. Charles C. Brausch, M.D., a neurologist, for consultation. Their joint diagnosis was that Mr. Varga was suffering from Guillain-Barre syndrome. A lumbar puncture showed elevated protein of 180 milligrams in his spinal fluid. Areflexia (loss of tendon reflexes) was also observed. The facial palsy was still present on March 11 according to the doctor's notes.

At Highland View Hospital the diagnosis was Guillain-Barre syndrome with residual right central facial weakness and loss of power on the right side. Some of his reflexes were still decreased. Subsidiary conditions were gout, uremia, and hypertension. He was discharged from Highland View Hospital on May 27, 1977.

## II.

### A.

Plaintiff and the United States have stipulated as "true and not at issue" that the United States' investigation of GBS cases among swine flu vaccinees began at least as early as December 2, 1976. On or about December 6, 1976, New Jersey began an investigation after receiving a report of a single case of GBS in a vaccinated individual. On December 10, 1976, Colorado was asked to conduct a survey for GBS; and on December 11, 1976, the GBS investigation was expanded to 11 states. The Centers for Disease Control (CDC) issued a press release on Guillain-Barre syndrome on December 14, 1976. It stated that fifty-four cases in ten states had thus far been reported. Of these fifty-four, thirty had received the inoculation anywhere from one to thirty days before the onset of the symptoms. After additional data from four states was reviewed, a conference call was held on December 16, 1976. CDC personnel and outside experts participated. It was unanimously agreed that a moratorium on the administration of the swine influenza vaccine should be declared for about one month so that additional data could be obtained and evaluated. A moratorium on the swine flu program was called on December 16, 1976.

It is further stipulated that "the decision to stop the program in December 1976 was based on the finding of Guillain-Barre syndrome associated with the swine flu vaccination." When the immunization program was suspended on December 16, 1976, "over 42 million doses had been administered to the American public."

Dr. Martin Goldfield, who testified for the plaintiff, and Dr. Alexander Langmuir, who testified for the United States, are medical doctors whose specialty is epidemiology.[2]

2. Dr. Martin Goldfield graduated from Boston University School of Medicine in 1950 and specialized in infectious diseases from 1950–53. From 1953 until 1970 he taught infectious diseases and epidemiology at various universities. From 1971 to 1977 he was Assistant Commissioner, Division of Laboratories and Epidemiology, New Jersey State Health Department; and during 1977–78 he was Director of Research, Division of Laboratories, Epidemiology and Research, New Jersey State Department of Health. While with the New Jersey State Department of Health, he held adjunct professorships in epidemiology and public health.

From 1978 until 1983 he served as professor of epidemiology, School of Public Health, University of South Carolina; and he was an adjunct professor in microbiology and preventive medicine.

Dr. Alexander Langmuir obtained his medical degree after graduating from Cornell University Medical College in 1935. In 1940 he obtained his masters degree in public health at Johns Hopkins University School of Public Health.

Following service as a Deputy Commissioner of Health in the Westchester County Health Department in 1941–42, from 1942–46 he served as an epidemiologist with the Army Epi-

Dr. Goldfield, in a letter of July 2, 1981 to counsel for plaintiff Varga, Scott E. Stewart, Esq., stated that there appeared to be

serious methodologic problems in the analysis of CDC data that was published in the *American Journal of Epidemiology,* Volume 110: 105–123, 1979 with Lawrence B. Schonberger as senior author and presented by Alexander Langmuir in his deposition.

Among other things, he noticed a change in the numbers of GBS cases "between preparation of Langmuir's and of Schonberger's papers." He also indicated that for

certain analysis not reported in either study, a complete line listing of GBS cases reported among the immunized population as required together with the information on each case was detailed below.

Later in the letter he listed 24 pieces of information concerning the line listing of vaccinated GBS cases that counsel requested.

Dr. Goldfield's inquiries, brought to the attention of Judge Gerhard Gesell by plaintiff's counsel, led to the judge reopening discovery in the multi-district litigation. Pursuant to the reopening order, three categories of documents were produced by the CDC and made available to each party.

In transmitting the documents on November 20, 1981 to counsel for the plaintiff, counsel for the Department of Justice first identified "a one-page table of the denominator data taken from the Schonberger study." This refers to the Schonberger article identified by Dr. Goldfield, *supra.* This one-page table contains two columns of numbers under the date of October 3[3] and a single column of numbers under the dates October 10 through December 12. Each horizontal row of numbers (vaccination totals) is identified by a code number and an abbreviation for each of the 50 states and the District of Columbia. Describing the content of the table, the caption states: "Adjusted Weekly Vaccinations in Adults [18 years and older], by State and Date of Administration (Mid Period), National Influenza Immunization Program, October 1—December 16, 1976."[4]

demiological Board, Fort Bragg, North Carolina and the Commission on Acute Respiratory Diseases. Three years as an associate professor of epidemiology at Johns Hopkins University followed.

From 1949–70 he was Chief Epidemiologist, United States Public Health Service, Communicable Disease Center, (presently Centers for Disease Control), Department of Health and Human Resources. While with the CDC, he served as a professor of preventive medicine and community health at Emory University, Atlanta, Georgia. From 1970 until retirement in 1977 he was visiting professor of epidemiology at Harvard Medical School.

Dr. Goldfield defines epidemiology as "the study of the distribution and determination of human affections." Dr. Langmuir defines epidemiology as

that branch of scientific study and analysis of the important chronology factors of the occurrence of disease in populations ... It's distinct from clinical medicine in that clinical medicine deals with disease in the single person and epidemiology deals with a disease in a community, a number of cases in measured populations.

3. Dr. Goldfield believes that the numbers in the first column report vaccinations prior to October 1. Dr. Langmuir believes that these numbers tally vaccinations for October 1 and 2. Since the parties have stipulated that "no swine flu immunizations were given to the American public, other than in the field trials, before October 1, 1976," Dr. Langmuir's conclusion is accepted.

4. The dates across the top of the table, October 3, October 10, etc., all fell on Sunday in 1976. In substance, Dr. Goldfield testified that the listed vaccination totals obviously did not all take place on the first day of the calendar week (that is Sunday). He interprets the foregoing caption to mean that the totals were tabulated at the mid-period of each calendar week (that is Wednesday) and that this number includes the vaccinations administered during the latter half of the preceding week. Therefore Dr. Goldfield says that the vaccination totals, Wednesday to Wednesday, listed on the table (government's Exhibit 14D3) do not represent the number of vaccinations administered in the calendar weeks, that is, weeks ending October 2, October 9, etc.

Although Dr. Langmuir testified "that what [Table 14D3] states at the top makes no blessed sense," he conceded that treating the dates at the top as midweek dates "is the most logical interpretation of this table." The court will treat the "Oct. 3" column as listing the number of persons vaccinated between October 1 and

Pursuant to Judge Gesell's order, the parties also received a computer printout entitled "Statistical Analysis System" dated November 13, 1981. This printout contains a line listing for each of the 1,098 GBS cases reviewed in the Schonberger study, *supra* at 9. The line listings provide information under column abbreviations. Left to right, these columns provide: the GBS case number, identification number, state, age, sex, onset date, immunization status, vaccination date, and whether or not diagnosed by a neurologist or whether the origin of diagnosis is unknown. The remaining 15 columns characterize the illness (*e.g.*, progressive motor weakness), and show the extent of motor involvement at the height of illness, whether or not three or four extremeties were involved, whether the trunk was involved, and whether cranial nerves were involved.

Finally, the parties received pursuant to Judge Gesell's rediscovery order approximately 1,500 computer printout sheets. Each included the illness information just described and additional data, *e.g.*, state number, record number, whether vaccinated and when, and onset of symptoms, etc. While these back-up records include the 1,098 cases analyzed in the Schonberger study, these records also include military GBS cases and GBS cases occurring prior to October 1, 1976. Some printouts are duplicates, contributing to the excess of over 1,098 case printouts.

The rediscovery material was turned over to Dr. Martin Goldfield. It forms the basis of his calculations, tables and testimony. The Department of Justice in the fall of 1981 assembled a panel to examine and evaluate the rediscovery material. The panel includes Dr. Langmuir as coordinator, Dr. Maurice Victor, head of the Department of Neurology at Cleveland Metropolitan

General Hospital, Dr. Leonard T. Kurland, head of the Department of Epidemiology, Mayo Clinic, Dr. Neil Nathanson, professor of Microbiology, University of Pennsylvania and Mr. Dennis Bregman, Biostatitician at CDC and graduate student, Harvard School of Public Health. Dr. Langmuir's opinions and conclusions grow out of his examination of the rediscovery material in serving as coordinator of the panel.

Dr. Goldfield prepared a number of tables (1 through 4 and 6 through 12), all of which utilized 41.490 million for the total number of vaccinees. This number was reported by Dr. Langmuir in his September 1979 article in the "Journal of the Royal Society of Medicine" (Vol. 72, p. 666). These tables, table 5 (all hereafter referred to as Dr. Goldfield's original tables) and tables 13–21 were received in evidence as plaintiff's exhibit No. 25. Post-trial, Dr. Goldfield submitted, and the court received in evidence as plaintiff's exhibit No. 25C, revisions of tables 1 through 4 and 6 through 12 (hereafter, Dr. Goldfield's revised tables). The revised tables have the same components as the original tables, except they represent new calculations based on CDC's estimate of 43.327 million vaccinees. Dr. Goldfield also prepared other tables which relate to tables and graphs prepared by Dr. Langmuir, and these are also considered.

Dr. Goldfield agrees that table 12 of his set of tables is at the "heart of his analysis" of this case. The first column of the table identifies weeks after immunization with a separate line listing for weeks 1 through 5. Thereafter appear weeks 6–7, 8–10, and 11–16. The second column contains "Expected Number of GBS Cases," and the third column contains "Observed Number of GBS Cases." The fourth and final column contains the relative risks computed from the numbers in columns 2 and 3 for

October 6, and the "Oct. 10" column as listing the number of persons vaccinated between October 7 and 13, etc. Analyzed in this manner, the table sets out 11 weekly vaccination cohorts, with the "Oct. 3" cohort including only six days (Oct. 1–6) and the "Dec. 12" cohort including eight days (Dec. 9–16). The adjustment is necessary because while the cohorts

run from Thursday to Wednesday, the vaccination program was commenced on a Friday (October 1) and halted on a Thursday (Dec. 16). Although it is impossible to ascertain the precise number of persons vaccinated on a given day, an estimate can be obtained by dividing the cohort vaccination total by the number of days in the cohort.

each category of weeks after immunization. The relative risks (observed number of GBS cases divided by expected number of GBS cases)[5] shown in columns 1 and 4 are juxtaposed below:

| Weeks After Immunization | Relative Risk | |
|---|---|---|
| | (Original Table) | (Revised Table) |
| 1 | 5.37 | 4.60 |
| 2 | 14.44 | 12.50 |
| 3 | 18.65 | 16.30 |
| 4 | 7.79 | 6.79 |
| 5 | 5.94 | 5.13 |
| 6–7 | 3.78 | 3.25 |
| 8–10 | 3.71 | 3.08 |
| 11–16 | 4.29 | 3.24 |

It is evident that these calculations of relative risk form the basis of Dr. Goldfield's opinion

> that in quantitative terms[,] an individual who suffered GBS 16 weeks after immunization had a 75 percent likelihood of having suffered GBS as a result of immunization rather than some other extraneous cause.

In contrast, epidemiologist Alexander Langmuir, M.D., testified that there is a "clear epidemiological relationship in one through six weeks after immunization." He said "there is a clear temporal relationship so that I draw a conclusion of causal relationship," and "some cases in the seventh and eighth week have a causal relationship, but no relationship after the ninth week."

Dr. Langmuir explained that the panel has met four times. It has not yet issued a final report. The conclusions and opinions which he expresses are his own and the tables and graphic figures offered by the government and received in evidence are prepared by him.[6]

In the continuation of part I, the focus is on epidemiological evidence. Part II first dwells on the neurological evidence, especially the testimony of the neurologists, and then reviews the impact of the immunological evidence in this case. In part III, the court reaches its final conclusion.

### B.

In reaching his conclusion that there is a relative risk of 3.24 for persons with an onset of GBS 11 to 16 weeks after immunization, Dr. Goldfield principally relies on his revised tables 6–8 and table 1. In revised table 6, Dr. Goldfield computes a 49% drop in "crude attack rates of immunized cohorts older than 17" with onsets of GBS after December 18, 1976. He obtains this percentage drop by first comparing his calculated GBS rate for each of weeks two through nine after December 18 with his calculated GBS rate for weeks two through nine before December 19. He calculates the differences in terms of percentages for each of weeks two through nine and then

**5.** A relative risk of two indicates a 50 percent likelihood that the GBS onset was caused by the vaccine. Any number above two indicates a 51% or greater likelihood that the onset of GBS was related to the immunization.

**6.** In no instance does it appear that Dr. Langmuir bases any of his opinions or conclusions on the data underlying his article in the *Journal of the Royal Society of Medicine*, Vol. 72, September 1979, "Guillain-Barre Syndrome: The Swine Influenza Virus Vaccine Incident in the United States of America, 1976–77: Preliminary Communication." His 1979 article used as the total of vaccinated persons the number 41,485,000. Dr. Goldfield adjusted the "number immunized as reported by Langmuir ... by a factor of 0.979327 to remove those under 18 years of age." However, Dr. Langmuir in his current studies has accepted as the number of vaccinated adults (over 17 years old) the total of 43.3 million which is the sum of adult vaccinations per week which appear on the bottom

line of the "one-page table of the denominator data taken from the Schonberger study [defendant's Exhibit No. 14D3]."

Since Dr. Langmuir has presently not used the vaccinated population from his 1979 article and instead has used 43.3 million as the vaccinated population in accordance with the evidence in this case, this total is accepted and determined to be applicable in this case.

Dr. Langmuir concedes errors in the preparation of his chart on p. 664 of his article and in the computation of relative risks therein. On cross-examination he testified:

> Mr. Stewart, I am totally uninterested in this table. It has so many flaws. I have reanalyzed the data. This is full of insufficient and limited paralytic cases. It has no meaning or value. I'm going to correct it as soon as I possibly can.

No reliance is placed by this court on Dr. Langmuir's computations in his Royal Society of Medicine article in view of his concessions of error.

averages these percentages to compute the forty-nine percent drop in attack (incidence) rates of the immunized adult cohorts after December 18.[7]

In original table 1, Dr. Goldfield computed the attack rate among the unimmunized population for October 1—December 18 as .22 per million per week. He computed the rate for the period of December 18—January 29 as .11, "representing a 50.5% drop." In his revised table 1 he gives rates for the corresponding periods of 0.2316 per million per week and 0.1117 per million per week "representing a 51.8% drop."

Dr. Goldfield declared that even prior to December 18, 1976 the GBS cases among the unimmunized population which were reported produced an "observed rate," but "not necessarily the true rate." Dr. Goldfield agreed with defendant counsel's statement that if ".22 is not the true rate, then we know for certain that .11 can't be the true rate either."

Asked if his computed relative risk hinged upon the "observed rate figure as calculated by you of .11 per million persons per week," Dr. Goldfield answered:

> Well, it hinges on .22 for the earlier period as well as .11 for the later period.

However, concerning these rates, he stated that "there is no way to prove whether they represent the true rate [of occurrence of Guillain-Barre Syndrome] and they probably are underestimates. They are reported rates."

Short of a resumed nationwide surveillance of GBS cases among the unimmunized population that is shown to be exhaustive, there is probably no way to ascertain a true national rate of incidence of GBS among the unimmunized population. Thus, Dr. Goldfield is found to be correct when he says that "there is no way to prove whether [.22 (Oct. 1—Dec. 18, 1976) and .11 (Dec. 19—Jan. 29, 1977)] represent the true rate[s]." Nonetheless, taking the drop in the attack rate of the unvaccinated GBS cases, which he now calculates at 52%, and the drop in the attack rate of vaccinated GBS cases, which he now calculates at 49%, Dr. Goldfield postulates from the closeness of these percentages that he may adopt the post-December 18 unvaccinated rate of .11 per million persons per week as his base line. He then uses this "reported rate" of .11 in calculating a relative risk of 3.24 for persons with an onset of GBS 11 to 16 weeks after immunization.[8]

7. In revised table 7, Dr. Goldfield uses a different mode of calculation to show underreporting of vaccinated cases. Upon the premise that the attack rate should vary for those persons who suffered GBS in the same number of weeks of onset after vaccination, he has calculated an adjusted number of cases for the period after December 18, 1976. To obtain a number for each of these weeks he multiplies his previously calculated weekly attack rate after December 18 by the immunized population at risk before December 18 for the same number of weeks. Multiplying the totals of each column he obtains an adjusted rate of 10.74 for the immunized population between December 18 and January 31. In table 8 he expresses in a percentage the difference between 10.74 and 19.92, the attack rate he computed for the immunized population between October 1 and December 18. Thus he computes a 46% drop after December 18.

In original tables 7 and 8, Dr. Goldfield calculated a 57% drop after December 18. This prompted Dr. Langmuir to say:

> Well, Table 7 merely is an adjusted rate and it shows then in Table 8 that the risk is the same, so that I don't know why he showed

Table 7 at all. It contributes nothing more to even his case.

As counsel for the plaintiff commented in putting another question to Dr. Langmuir, "All right. That's because there were two mathematical formulae that came up with the exact same thing." Now revised, tables 7 and 8 show a 46% drop while table 6 shows a 49% drop in GBS vaccinated cases after December 18, 1976. Thus, the second mathematical formula now tends to challenge rather than support the table 7 calculated drop rate.

However, since the probative value of revised tables 7 and 8 is lessened because they are predicated upon the "adjusted number of GBS cases," these tables will be given no further consideration.

8. He concluded that the evidence discloses a truly enhanced relative risk as far out as the eleventh or twelfth week after vaccination and that this could not be accounted for by any reasonable level of biased reporting. He considered alternative base line rates for the unimmunized. He determined that if he used .22 for the entire period that he was guilty of overestimating the expected rate, and thus he would be

Asked what original table 6 told him "in the way it was presented," Dr. Langmuir noted that it showed "an average of a 57 percent drop in the rates as [Dr. Goldfield] has calculated them for those having onsets after December 18 [as compared with onsets before December 19, 1976]." He was further asked to comment on the validity of computing rates based on the number of cases. The doctor responded:

The queasy feeling I have about this table is that on the left-hand panel it is seven cases divided by only seven million person weeks, whereas on this side it is 28 million [persons at risk]. And this is the tail end of a series. If there are errors, even relatively moderate 5 or 10 percent errors that are systematic errors in the reporting by weeks of the number of vaccinees, this would magnify in ways that are hard to predict because we don't know where those errors are ... I have a queasy feeling that the denominators are hardly justifying this kind of an analysis.

Further questioned, Dr. Langmuir added:

I have a very uncomfortable feeling about his numbers [which] are large in the second and third week[s], which is all part of our phenomenon of the epidemic, and then there is not a similar epidemic on the right side, although the GBS rates show moderate rates there, there is nothing comparable to the rates here.

This is an interesting analysis, and I don't doubt that there was a fall off in reporting [of vaccinated cases]. I question that the fall off in reporting was 57%.

The revisions in table 6 by Dr. Goldfield show a drop off of 49% in the incidence rate of vaccinated cases. Thus, the 57% drop, questioned by Dr. Langmuir, is now superseded by Dr. Goldfield's revised 49% drop in the rate of vaccinated cases. This 49% drop must be compared against his revised 52% drop in the incidence rate of unvaccinated cases.[9]

To test the arithmetic of Dr. Goldfield's calculations, the court has made calculations based on a method of analysis similar to that of Dr. Goldfield. The court first compiled its own totals of the number of persons at risk for weeks 2 through 11, both before December 19 and after December 18. It did so using the numbers immunized as reported on defendant's exhibit No. 14D3. The onsets of vaccinated GBS cases for weeks 2 through 11 were derived from the case printouts. Incidence rates were computed for each of the weekly periods by dividing the number of observed cases by the number at risk for that period. Percentage drops for the weeks two through five, seven through nine, and eleven (increases were computed for the sixth week and the tenth weeks) when averaged equaled a 46% drop in the incidence rate after December 18. This 46% drop is 3% less than the 49% computed by Dr. Goldfield in revised table 6. An identical percent drop of 46% after December 18 is computed by Dr. Goldfield in revised tables 7 and 8. Thus, Dr. Goldfield's arithmetic is roughly but sufficiently verified.

Notwithstanding verification of the arithmetic of Dr. Goldfield's method of analysis, its validity remains in doubt. Dr. Langmuir spoke of the possibility of "5 or 10% errors that are systematic in the reporting

guilty of bias. He said if he used .185 (the base line rate used by Dr. Langmuir in his 1979 article) for the entire period, he would be using a rate that is lower than the expected rate before December 18 and higher after December 18. If he turned to the literature for a true rate, he would have to assume that the GBS case reporting was 100 percent which was not true. Therefore, he determined that none of these choices of rates should be adopted.

9. With reference to Dr. Goldfield's tables, Dr. Langmuir referred to table 3 in which for weeks 8 through 11 after immunization, October 1, 1976 to December 18, 1976, the expected number of GBS cases are 2.110 and less. In calculating relative risks (observed cases divided by expected cases), Dr. Langmuir states that as an epidemiologist he would not "have calculated a risk without at least, oh, four or five cases in my denominator, because the variability is such that the relative risk becomes meaningless." Referring more generally to the calculation of relative risks, he says that he likes "to have confidence limits to get a sense of whether they really are statistically meaningful." He did not recall that confidence limits appear in any of Dr. Goldfield's tables.

by weeks of the number of vaccinees," and his "queasy feeling that the denominators are hardly justifying this kind of an analysis." Dr. Langmuir, because of his cohort analysis,[10] questioned the population at risk number in Dr. Goldfield's table 6. He did so

> because the second cohort is a large one, and we believe that the explanation for that is that there was an underestimate of the number of vaccinees . . . and later, cohort five is based—primarily the column on the right [of table 6] is based primarily on cohort number 5, and I believe the vaccination data by weeks is overestimated there.

Counsel for the plaintiff asked Dr. Langmuir if he was "going to rely on defendant's exhibit No. 14D3 in part and not in other parts?" He responded:

> I have no choice but to accept it . . . I think I testified early and repeatedly that we work with the data we've got. We do our best to evaluate the errors in that data and we do our best to make accountings for this in our interpretations . . . We know that it's not the balance of the Federal Reserve Bank of Cleveland.

> It's crude census data with enormous numbers of different sources and many,

many opportunities for error. We think the total is pretty good.

Counsel put a further question:

> And what Dr. Goldfield shows is that there is a larger percentage drop in the vaccinated cases reported after December 18 for every single, solitary week that he looks at, 2 through 9, isn't that true?

Dr. Langmuir answered:

> I have reason to doubt the accuracy of the population data week by week. And I've told you that I think a reasonable correction, as in cohort two and five, would make that estimated reduction considerably less.

Then another question:

> To make that change, you've got to change 14D3, you've got to—you've got to not depend on this, don't you?

Dr. Langmuir responded:

> On the contrary. I do the best I can with the data I've got, and then I add to this my total experience. And I'm here to express my personal evaluation. . . .

Dr. Goldfield's table 6 must be weighed against Dr. Langmuir's rejections of both table 6 and Dr. Goldfield's analysis. The court is not persuaded that the premises underlying Dr. Goldfield's use of the population-at-risk numbers on the left and right panels of table 6 are reliable. Yet, as seen,

---

10. Relating to the cases classified as extensive, Dr. Langmuir has prepared cohort analyses of cases which he classified as "extensive." Five cohorts of vaccinees, each immunized during successive periods, are separately plotted by weeks of GBS onset. The points are graphed as a curve against a theoretical log normal distribution curve. Based on his graphs, Dr. Langmuir concludes that "whatever was in the swine flu vaccine was acting with surprising consistency throughout the period." The horizontal axis is weeks of onset and the vertical axis is "cases per million person weeks." For each cohort the case rates uniformly peak at about two to three cases per million persons per week at about the third week of onset after vaccination and then drop off. The cases rates are one or less than one for the fourth week. For weeks of onset beyond four, the case rates are less than one. For a number of weeks of onset varying with each cohort, the case rates are fractions of one finally reaching or going below a baseline of .15 (a postulated norm for unvaccinated cases).

In cohorts one through four, the log normal distribution curve generally conforms to or falls within the cohort curve. The relative position of the fifth cohort curve and the log normal distribution curve are reversed with the latter curve enveloping the cohort curve. Dr. Langmuir posits that the 5th cohort (immunized between December 11 and 16), falls below the log normal curve because of an error in the reporting of total vaccinees. He states "these are probably denominator [number vaccinated] rather than numerator [number of cases] errors." He believes there was an underreporting of vaccinations in the last week of October and in the first week of November. This underreporting would explain the rise of the cohort 2 graph's above the log normal curve (contrasted with cohorts 1, 3, and 4), and a corresponding drop of the peak of the cohort 5 graph to below the peak of the log normal curve. He does not attribute the drop of the peak in cohort 5 to underreporting of vaccinated cases after December 18, 1976, as suggested by plaintiff's counsel.

table 6 and its revised calculation of a 49% drop in the incident rate of GBS cases after December 18, close to the computed drop off of 52% in the incidence rate of the unvaccinated population, is essential to Dr. Goldfield's determination that an unvaccinated GBS rate of .11 after December 18 should be adopted as the "reported rate." It is this "reported rate" of .11 that Dr. Goldfield uses in calculating a relative risk of 3.24 for observed GBS cases having an onset of 11 to 16 weeks. Hence, the failure of the plaintiff to persuade the court that the premises of Table 6 are reliable causes the court to not accept the 3.24 relative risk computation in Table 12.[11]

## C.

The underreporting of GBS cases having onsets after December 18, 1976, recognized

by both Dr. Goldfield and Dr. Langmuir, cannot now be bolstered. Resumption of the 1976–1977 national surveillance is neither contemplated nor feasible.

However, the closeness in the percentage drop after December 18 in the incidence rates of vaccinated and unvaccinated GBS cases which Dr. Goldfield has computed, as reflected in his revised tables 1, 6, 7 and 8, will be compared with the incidence rates of vaccinated and unvaccinated GBS cases in the state of Michigan. This may be done because the quality of case ascertainment in Michigan was "excellent" according to the sworn testimony of Joel G. Breman, M.D., D.T.P.H., CDC epidemiologist. From the summer of 1976 to June 1977, Dr. Breman was assigned by the CDC to work with the Epidemiology Division, Michigan Depart-

11. A note at the bottom of Dr. Goldfield's table 12 indicates that "nine cases of GBS among the immunized are included which are tabulated by *minimal* possible incubation period." These nine cases are among the 31 which Dr. Goldfield has cited in table 12 with onsets in weeks 11 through 16 after vaccination. Seven of these 31 cases have been questioned by the defendant.

Three of the cases, printout sheet numbers 1279, 2200 and 2083, are questionable because their vaccination dates were recorded as being in September, before the immunization period began. Three other cases, record numbers 1294, 2195 and 1212, were questioned based on conflicting or missing information.

Number 1294 was switched from unvaccinated to vaccinated status by Dr. Goldfield. On the printout sheet for 1294 in the space provided to show whether the patient had been given the swine flu vaccine, the entry is "no." Yet, immediately underneath, a vaccination date of "100576" is provided. Dr. Goldfield argues:

What is persuasive to me is that under swine influenza vaccine a specific date of immunization is recorded. Now, with that specific information, it appears the likeliest possibility that someone didn't manufacture a date of swine flu immunization and put it in the record.

Number 2195 was also changed from unimmunized to immunized by Dr. Goldfield. The 2195 printout indicates that there was no vaccine administered, yet immediately underneath a vaccination date of "110276" is printed. Even though a vaccination date is provided, the printout indicates that the vaccine manufacturer and vaccine lot number are "unknown."

Number 1212 was originally classified as immunized with vaccination date designated as an unknown day in October 1976. There was

no vaccine manufacturer given. Dr. Goldfield computed its minimum onset period by counting the days between the last day of October and January 22, 1977, the date of onset. He then determined that 1212 has a minimum onset period of 11 weeks after immunization. The seventh case, number 1802, was questioned but not challenged by the defendant. Though the printout indicates that no flu vaccine was administered, it also indicates a vaccination date, vaccine manufacturer and vaccine lot number. At final argument, government counsel agreed that this case should be included as a vaccinated case.

If the six challenged cases are eliminated from the 11 to 16 weeks of onset category, Dr. Goldfield's table 12 relative risk has to be calculated based on 25 instead of 31 cases. This results in a drop in the calculated relative risk from 3.24 to 2.61. Thus, the six disputed "long onset" cases play a vital role in Dr. Goldfield's concluding that there is a significantly enhanced risk of contracting GBS in the eleventh through sixteenth weeks after vaccination. However, the conflicting or missing information in each of these six cases, at a minimum, sheds doubt upon the validity of including them in a "late onset" relative risk analysis. Although with additional information it may be possible to resolve the question of whether these cases were properly included by Dr. Goldfield, see p. 23, *supra*, it is not possible on the present record to make a conclusive determination. At any rate, even if these six cases are included, Dr. Goldfield's conclusion is still based upon the use of his lower unvaccinated rate base line which this court has rejected.

ment of Public Health. His special assignment of studying complications resulting from swine flu inoculations in Michigan included reporting to the CDC the onsets of vaccinated and unvaccinated GBS cases.[12] Based on the work done in Michigan, Dr. Breman and Norman S. Hayner, M.D., M.P.H. Epidemiology Division, Michigan Department of Public Health, have prepared an article, "Guillain-Barre Syndrome and Relationship to Swine Influenza Vaccination in Michigan, 1976–1977" (hereafter Breman-Hayner article). A June 1981 draft of this article is Joint Exhibit No. 2. While yet unpublished, a December 1982 draft of the article, submitted after trial, is received in evidence as Joint Exhibit No. 2C.

When asked how confident he was of Michigan's case ascertainment, Dr. Breman replied:

Here it would be difficult to quantitate confidence numerically. However, because of the fact that we were, I think, very, very aggressive, we had these full-time staff personnel trained in epidemiology with graduate degrees in epidemiology.

Because of the fact that ... ascertainment of cases was given the highest priority in the state and because of the fact we continued for a full year of recording and, indeed, some of this information continued even after I left, this information data gathering, I am confident that our completeness of case ascertainment was excellent.

The article reports:

Use of four surveillance methods [13] produced numerous repetitive discoveries of the same person indicating that virtually all cases of GBS occurring from July 1, 1976 to April 30, 1977 were probably detected. Over 300 possible cases were screened and over half were excluded on the basis of not meeting case criteria.

Accepting the report's conclusion, the court finds "that virtually all cases of GBS occurring from July 1, 1976 to April 30, 1977 were probably detected."

**12.** The CDC received and used the GBS case line listings compiled by the Michigan Department of Epidemiology's surveillance team. The CDC case printouts of the line listings include 68 Michigan cases having onsets between October 1, 1976 and January 31, 1977 (not including a CDC unvaccinated case having a January onset which Dr. Breman identified as being a case with a February onset). However, the final Michigan line listings prepared by the Michigan Department of Epidemiology and utilized by Doctors Breman and Hayner in preparing their article on GBS incidence rates in Michigan include only 66 cases. The CDC has two cases which do not appear in the Michigan Department of Epidemiology's line listings, and the department's line listings include one case which the CDC does not list. (The remaining 65 cases identically match.)

Dr. Breman was unable to account precisely for these differences. He testified, however, that

information was periodically sent to CDC. The changes in diagnosis, cases being added or deleted, they were sent from Michigan as was the final line listing.

He explained that the reporting efficiency was based on these items:

One is the fact that a diagnosis did not come to the hospital record room library, the computer printout, until weeks or months after the diagnosis was made in some instances. Secondly, a clinician would often wait to see the evolution of a patient, of the disease problems within the patient before giving the diagnosis.

While he was able to speak of the Michigan reporting efficiency, he could not "conclude that the efficiency of national recording was the same as that that we had in Michigan." All in all, it is reasonable to conclude that the Michigan totals are reliable and that CDC may have failed to update the latest revision of Michigan totals.

**13.** As recounted in the Breman-Hayner article, Michigan's surveillance was carried out by: (1) contacting all 42 neurologists and neurosurgeons in the state four times by telephone, letter, or both, between December 20, 1976 and June 30, 1977; (2) contacting all 375 hospitals in Michigan three times between January 21 and June 30, 1977 and reviewing discharge diagnoses dating back to July 1, 1976 (the surveillance team included two graduate epidemiologists who worked full-time in the field visiting hospitals, etc.); (3) contacting all 1,006 registered physical therapists in the state by letter in February 1977; and (4) placing requests for GBS reports in the bulletin of the state medical society and asking local departments of health to detect cases and report them to the state health department.

### 1.

Using 151.2 million as the total adult population of the United States during the relevant period (October 1, 1976—January 31, 1977) and 43.2 million as the number of persons vaccinated, one finds that there were 108.0 million unvaccinated adults in the U.S. after December 18, 1976. Since there were 4.0 million unvaccinated adults in Michigan after December 18, Michigan represented 3.7 percent (4.0/108.0) of the unvaccinated adult population. Since Michigan had 2.3 million vaccinated adults, as reported in the Breman-Hayner article, Michigan represented 5.3 percent of the U.S. vaccinated population (2.3/43.3).[14]

Comparing the respective number of reported vaccinated and unvaccinated GBS cases in Michigan to the total numbers obtained by the CDC, one can determine the extent to which Michigan had a better reporting rate than the rest of the nation for its unvaccinated and vaccinated cases. According to the Schonberger study, the CDC received a total of 1,098 cases of which 15 had onsets before vaccination, and eight had unknown vaccination status. Thus, there were 1,075 usable reported cases, including 532 vaccinated cases and 543 unvaccinated cases. A case-by-case check of the statistical analysis reveals that 120 of the unvaccinated cases and two of the vaccinated cases were under 18 years of age. These 122 cases are excluded for purposes of the following comparison.

Using 530 as the number of vaccinated nationwide cases and 423 as the number of unvaccinated nationwide cases reported between October 1, 1976 and January 31, 1977, the court finds that Michigan accounted for 6.2% (33/530) of the vaccinated cases and 5.9% (25/423) of the unvaccinated cases in the 18 and over population reported during this period (see figure 3 of the Breman-Hayner article).[15] The above percentages of the adult cases and populations are tabularized below:

3.7% = Michigan's share of the nation's unvaccinated adult population.

5.3% = Michigan's share of the nation's vaccinated population.

6.2% = Michigan's share of the nation's vaccinated cases.

5.9% = Michigan's share of the nation's unvaccinated cases.

Comparing these figures, one finds that Michigan had a rate of reporting of 1.16

$$\left(\frac{6.2\% \text{ of nation's unvaccinated cases}}{5.3\% \text{ of nation's vaccinated population}}\right)$$

compared to the nation as a whole for its vaccinated cases, and 1.59

---

**14.** In *Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856–1857 n. 20, 52 L.Ed.2d 396 (1977), the Court noted that "considerations such as small sample size may, of course, detract from the value of [statistical] evidence, see, *e.g., Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–24 [94 S.Ct. 1323, 1333–1335, 39 L.Ed.2d 630] (1974)." What then is "small sample size"? In Williams, "A Sampler on Sampling," Chapter 4, p. 45, the author states:

Samples are cheaper and faster than censuses because they are usually only a fraction of the size. Samples are often less than 1% of the size of the target population and are nearly always less than 5%. Occasionally, samples may be as large as 20%, but these do not seem to be frequent and so far seem always to be associated with data stored in computers or very small populations.

Michigan's 2.3 million vaccinated persons represent 5.3% of the 43.3 million persons who were inoculated with swine flu vaccine. Thus the size of the sample of the 43.3 million, over 5

percent thereof, is large enough, applying the rule just described by Williams. But also the sample must be randomly selected:

An item is chosen "at random" from a population if in selection every item in the population has the same probability or chance of being selected; the process of selection does not favor any particular item either intentionally or inadvertently.

A. Naiman, "Understanding Statistics," p. 4 (1977). The evidence indicates that the people living throughout the United States 18 years old or over are all equally susceptible of contracting GBS. Any vaccinated group of 2.3 million persons located in any state in the nation, therefore, would have the same likelihood of contracting GBS. Hence, the vaccinated population of Michigan qualifies as a random sample of the vaccinated population of the nation.

**15.** The under 18 year old population has been purged from both national and Michigan numbers, *i.e.,* Michigan has 32 unvaccinated cases, but seven are under 18.

$$\left(\frac{5.9\% \text{ of nation's unvaccinated cases}}{3.7\% \text{ of nation's unvaccinated population}}\right)$$

for its unvaccinated cases. This variance in the report rates indicates that the nation as a whole reported a higher percentage of its vaccinated cases than its unvaccinated cases.

The pattern is even sharper when one looks at the month of January 1977 by itself. Using the court's tally of the cases reported nationwide to the CDC with onsets in January, one obtains 46 as the number of age 18 and over unvaccinated cases and 74 as the number of vaccinated cases. Using figure 3 of the Breman-Hayner article, one finds that Michigan reported four unvaccinated age 18 and over cases and two vaccinated cases. Thus, Michigan accounted for only 2.7%

$$\left(\frac{2 \text{ January Michigan vaccinated cases}}{74 \text{ January nationwide vaccinated cases}}\right)$$

of the nation's reported vaccinated cases, but 8.7%

16. The figures do not change dramatically if one uses tables 5 and 7 of Dr. Langmuir's charts to obtain the number of reported cases. As he testified, Dr. Langmuir excluded 33 cases because their status was uncertain. Thus, nationwide, his tables show 44 unvaccinated January cases and 61 vaccinated January cases. Using these numbers, Michigan accounted for only 3.3% (2/61) of the nation's reported vaccinated cases, but 9.1% (4/44) of the nation's unvaccinated cases.

17. Since Michigan represented only 4.2% of the total U.S. adult population, some variance is naturally expected between the GBS rates in Michigan and those for the nation as a whole. However, even if one arbitrarily doubles the number of Michigan cases with onsets in January so that Michigan has the same reporting rate as the rest of the country (5.4 percent/5.3 percent or four cases/74 total cases), one still finds that the reporting rate of unvaccinated cases was *far* higher than expected, but the reporting rate of the vaccinated cases was not.

$$\left(\frac{4 \text{ January Michigan unvaccinated cases}}{46 \text{ January nationwide unvaccinated cases}}\right)$$

of the nation's unvaccinated cases.[16] Put another way, in January 1977, Michigan had an unvaccinated reporting rate of 2.35

$$\left(\frac{8.7\% \text{ of nation's unvaccinated Jan. cases}}{3.7\% \text{ of nation's unvaccinated population}}\right)$$

compared to the nationwide unvaccinated rate. However, the reporting rate was only .51

$$\left(\frac{2.7\% \text{ of nation's Jan. vaccinated cases}}{5.3\% \text{ of nation's vaccinated population}}\right)$$

for the vaccinated cases.

Even though the figures obtained are subject to random variance because of the low numbers involved, they show that the underreporting of unvaccinated cases throughout the nation was greater than that for the vaccinated cases.[17] Indeed, for the month of January, the calculations tend to show that while a large percentage of unvaccinated cases were not being reported to the CDC, a significant percentage of the vaccinated cases were.[18]

Furthermore, this difference cannot be accounted for by differences in the times of vaccination between Michigan and the nation as a whole. Indeed, for the week of December 3–9, Michigan had 4.2% (204,605/4,821,263) of the total number of persons vaccinated. In the week of December 10–16, Michigan accounted for 8.4 percent (278,051/3,298,595) of the total persons vaccinated. This basic pattern is maintained for every vaccination week going back to October 24 (except for November 18— November 24 when Michigan had only 2.6% (135,527/5,170,401). Therefore, it is reasonable to expect that Michigan would have approximately 5.3% of the vaccinated cases with January onsets.

18. These findings are even more impressive when one does the same test for the months of December and November separately. Using the figures reported to the CDC for the nation as a whole and those presented in the Michigan study for Michigan, the court finds:

### November 1976

| | Vac. | Unvacc. (18 and over) |
|---|---|---|
| Total | 199 | 130 |
| Mich. | 12 (6%) | 6 (4.6%) |
| Reporting Rate Comparison | $\frac{6.0\% \text{ (percent cases)}}{5.3\% \text{ (percent popul)}} = 1.13$ | $\frac{4.6\% \text{ (percent cases)}}{3.7\% \text{ (percent popul)}} = 1.2$ |

Using the court's tally of the vaccinated and unvaccinated cases by dates of onset in December and January for the nation and the Michigan cases for the same months, further comparisons can be made to determine what significance, if any, the court should attach to the drop in the relative number of GBS cases having onsets after December 18, 1976.

Cases of vaccinated persons having December 1 through 18 dates of onsets total 179 with a daily rate of 9.8 (ranging from 1 to 20 daily). Cases of vaccinated persons having December 19 through 31 dates of onset total 47 with a daily rate of 3.6 (range 0–9). Cases of unvaccinated persons having December 1 through 18 dates of onset total 100 with a daily rate of 5.4 (range 2–11). Cases of unvaccinated persons having December 19 through 31 dates of onset total 42 with a daily rate of 3.2 (range 1–8). Two cases of unvaccinated persons have December "99" (unknown) onset dates and are not included in the count.

Cases of vaccinated persons having January onset dates total 78 with a daily rate of 2.5 (range 0–10). Cases of unvaccinated persons having January onset dates total 72 with a daily rate of 2.3 (range 0–5). The above figures are tabularized below:

| Nation | Nation (Vaccinated) | Nation (Unvaccinated) |
| --- | --- | --- |
| Dec. 1–18 | 9.8 cases/day | 5.4 cases/day |
| Dec. 19–31 | 3.6 cases/day | 3.2 cases/day |
| January | 2.5 cases/day | 2.3 cases/day |

As seen, the rate of onset in December of vaccinated cases dropped from a daily rate of 9.8 before December 19 to 3.6 after December 18 (170% drop). The onset of unvaccinated cases on the other hand dropped from a daily rate of 5.4 before December 19 to 3.2 after December 18 (70% drop). In January the daily rate of onset of vaccinated cases dropped further to 2.5 and the unvaccinated cases dropped to 2.3.

Looking solely at the 19 vaccinated cases with December onsets reported to the CDC from Michigan, 13 had onsets before December 19 and 6 had onsets after December 18. This represents a drop in the daily rate of 56%

$$(\frac{13 \text{ cases}}{18 \text{ days}} \text{ before, } \frac{6 \text{ cases}}{13 \text{ days}} \text{ after})$$

as compared to the 170% drop for the nation as a whole. Taking a closer look at the onset dates, the numbers change dramatically when one compares the pre-December 21 and post-December 20 rates.[19] There were three vaccinated cases in Michigan with December 19–20 onsets. After December 20 one finds that the average daily rate of Michigan cases drops 196% (16 cases/20 days before December 21, 3 cases/11 days after December 20). Excluding December 19 and 20 entirely, the drop is 167% (13 cases/18 days before [.72], 3 cases/11 days after [.27]). These figures are exceptionally close to those obtained for the nation as a whole (180% after December 20: 189 cases/20 days before December 21,

### December 1976

|  | Vac. | Unvacc. (18 and over) |
| --- | --- | --- |
| Total | 226 | 103 |
| Mich. | 18 (7.9%) | 5 (4.8%) |
| Reporting Rate Comparison | $\frac{7.9\% \text{ (percent cases)}}{5.3\% \text{ (percent popul)}} = 1.49$ | $\frac{4.8\% \text{ (percent cases)}}{3.7\% \text{ (percent popul)}} = 1.3$ |

Examining these figures, one can see that the vaccinated and unvaccinated reporting rates in November and December of 1976 are fairly close (November = 1.07V/1.24UV, December = 1.49V/1.30UV). Thus, it appears that the nationwide reporting of unvaccinated and vaccinated cases was fairly even for November and December. For January, however, the na-tionwide reporting rate of unvaccinated cases was far below the rate for vaccinated cases.

19. For purposes of this type of comparison, it is reasonable to cmpare post-December 20 cases and pre-December 20 cases because December 17–20 is extremely close to the time when the vaccinations were being administered. In other words, a number of "short onset" cases could still be expected on those days.

37 cases/11 days after December 20; and 196% excluding December 19 and 20: 179 cases/18 days before and 37 cases/11 days after).

Therefore, it is seen that in Michigan where there was "excellent" case ascertainment, the drop in the daily average of vaccinated cases was precipitous after December 20. Indeed, this drop steadily continued in Michigan; there were only two vaccinated cases reported in January and none in February. If Dr. Goldfield's theory of heavy national underreporting of post-December 18 vaccinated cases is valid, the national average daily rate should have fallen much more dramatically than Michigan's after December 20. Yet, that is not the case.[20]

Thus, it is seen that every comparison made of Michigan and the nation's pre-December 19 and post-December 18, 1976 vaccinated and unvaccinated GBS rates not only fails to support, but actually contradicts Dr. Goldfield's essential hypotheses: (1) that the drop in vaccinated GBS cases with onsets after December 18 is substantially the same as the drop in unvaccinated GBS cases with onsets after December 18; and (2) that each of the respective drops was due solely to underreporting.

### D.

Dr. Langmuir agreed with plaintiff's counsel that "[plaintiff] Varga has got a 16-week delay;" that "this surveillance [October 1—January 31] only lasted 17, a portion of 18 weeks altogether;" that "the only folks ... who have a delay in the 16 weeks that you are able to look at here are those who would be vaccinated in the first week or two of the program;" and that "all

the folks ... who have delays over 12 weeks, all of them are going to be reported after December 18, 1976." Dr. Langmuir additionally agreed that "[w]e've got small numbers, because the number of vaccinated persons we can look at are small."

In contrast to the time constraints of the nationwide surveillance period which limited the reporting of observed vaccinated GBS cases to those having onsets through January 31, 1977, the Breman-Hayner article reports that in Michigan

> [u]se of the four surveillance methods resulted in some persons being reported more than once, indicating that virtually all cases of GBS occurring from July 1, 1976 to April 30, 1977, were probably detected.

Nineteen weeks elapsed from the last Michigan vaccinations on December 17, 1976 until April 30, 1977. As the Breman-Hayner article reports:

> The approximately 2,300,000 persons vaccinated from October 5 to December 16, 1976, represent about 25% of Michigan's population. Over 80% of those vaccinated during the campaign received their vaccine by the end of November 1976, so that by the end of April 1977, they had been under surveillance for at least 5 months.

Hence, the Michigan surveillance was long enough to ascertain "virtually all GBS cases" having onsets from 11 to 16 weeks. What then does the Michigan case ascertainment disclose?

Figure 1 of the Breman-Hayner article is a block graph which shows "GBS cases by week of onset before or after vaccination, Michigan, July 1976—June 1977." By week

---

**20.** Under Dr. Goldfield's analysis, a significant number of vaccinated cases should have been reported in Michigan after December 20 because the "late onset" cases would have fallen into that time period. The figures do not support Dr. Goldfield. Of the three cases with December 19 and 20 onsets, only one was close to being a "late onset" case (12/20 onset—10/18 vaccination). The other two (12/19 onset—12/10 vaccination; and 12/20 onset—11/11 vaccination) occurred within the high relative risk weeks. The three December 25

and 26 onset cases all occurred within the high relative risk weeks (12/25 onset—11/13 vaccination; 12/26 onset—11/12 vaccination; and 12/26 onset—12/7 vaccination). And as previously stated, there were only two vaccinated cases reported in Michigan in January and none in February. Therefore, in Michigan where the reporting was excellent, the post-December 20 "late onset" cases simply were not present in the numbers necessary to support Dr. Goldfield's theory.

of onset after vaccination, it discloses two cases in the first week, ten cases in the second week, nine cases in the third week, four cases in the fourth week, two cases in the fifth week and four cases in the sixth week. No onsets occurred in weeks seven through 11.

The vaccinated GBS cases with onsets after 11 weeks are tabularized below by months of onset with onset weeks parenthesized. By combining information in the block graph with case identifications contained in the Michigan Line Listings made available to the court by counsel (but not the final Michigan Line Listings to which Dr. Breman referred in his testimony), it is possible to identify the Michigan late onset vaccinated GBS cases:

January 1977    2 cases (12 and 13)
February 1977   none
March 1977      4 cases (14,14, 15, 17)
April 1977       1 case (25)

The seven vaccinated cases with onsets in the months of January through April (see table above) are compared by the authors with the 30 GBS cases "in the vaccinated population which occurred in November and December 1976." After noting that in these months "a decrease in cases was observed in the unvaccinated group," Drs. Breman and Hayner state:

> By comparing the frequency of GBS cases among adults for the November-December period versus the January-April period in the vaccinated (30:7) and unvaccinated (9:19) groups, the difference is highly significant (p< 0.001).

The authors conclude:

> Hence, there is a statistical association between vaccination and GBS onset in November and December but not for the January through April period.

Drs. Breman and Hayner found "a significant difference between the GBS attack rates for the vaccinated persons in group C (onset of symptoms within six weeks of vaccination) and those for the other groups.

Within six weeks after vaccination the incidence of GBS among adults, 12.0 cases per $10^5$ person years, was significantly greater than the incidence of GBS among unvaccinated group A, or among vaccinated groups B (onset of symptoms before vaccination) and D (onset of symptoms more than six weeks after vaccination).[21]

However, the authors found that the "significantly greater" incidence rate within six weeks of vaccination ended after that period. Indeed, they concluded that "six weeks after vaccination the rate of GBS for vaccinated adults dropped below that of the background level of GBS in the entire unvaccinated population and in adults [.37 cases per $10^6$ person weeks]."

In his direct testimony, Dr. Goldfield criticized the Michigan study because its unvaccinated background rate of .37 cases per $10^6$ person weeks was based on the entire ten-month period. Dr. Goldfield stated that there was a "remarkably high rate" of GBS during the summer. Thus, the study's conclusions were "peculiar" because the vaccinated cases only occurred after October 5. Dr. Goldfield testified:

> [I]f one is really interested in the unvaccinated rate, then one must look at the unvaccinated rate from November on. The rates observed earlier may be a result of seasonal differences. The study is biased by including higher rates from earlier periods.

To test Dr. Goldfield's criticism, this court has compared the unvaccinated and vaccinated rates in Michigan between January and April 1977. This period is especially pertinent because most "late onset" vaccinated cases fell within this time period.

Using the official updated 1980 United States census, the over 18 population in Michigan after December 18, 1976 was approximately 6.3 million. Since approximately 2.3 million Michigan adults received the vaccine, 4.0 million Michigan adults remained unvaccinated. If the swine flu vac-

---

21. They found a relative risk of "6.4:1 (p< 0.005)" between the rate of group C and that of the unvaccinated adult population.

cine had no effect after the seventh week, one would expect the immunized (after seven weeks) and unimmunized GBS rates to be equal between January and April. All things being equal, the ratio of the vaccinated rate/unvaccinated rate should equal .58 (2.3 million vaccinated/4.0 million unvaccinated). If the swine flu vaccine's effect extends beyond six weeks, the comparison should yield a figure higher than .58.[22]

Comparing the number of vaccinated and unvaccinated cases, one finds that the GBS risk in the vaccinated population after six weeks is *below* that for the unvaccinated population, even when the high unvaccinated GBS rate summer months are ignored. For example, while there were seven reported vaccinated cases in January through April, there were nineteen unvaccinated cases in the same period. The ratio (7/19) is .37, which falls below the expected ratio and far below the ratio necessary to show an enhanced risk. Even when the month of May (excluded from the study because May and June case ascertainment was incomplete), in which two "later onset" cases occurred, is factored in, the ratio of .42 (9/21) is still far below that necessary to show an enhanced relative risk.[23]

Based on these calculations, this court finds that Dr. Goldfield's criticism of the Michigan study is unfounded. The court, therefore, accepts the conclusions of the authors that in Michigan "where virtually all GBS cases occurring from July 1, 1976 to April 30, 1977 were probably detected," an enhanced risk of contracting GBS lasted only for six weeks after inoculation with the swine flu vaccine. Therefore, the Michigan study refutes Dr. Goldfield's opinion that

> in quantitative terms an individual who suffered GBS 16 weeks after immunization had a 75% likelihood of having suffered GBS as a result of immunization rather than some other extraneous cause.[24]

### E.

It is timely now to examine Dr. Alexander Langmuir's classification of the CDC's 1,098 GBS cases (CDC's November 13, 1981 line listings and statistical analysis). Dr. Langmuir's classification will be studied to determine whether the system is arbitrary or biased, as asserted by the plaintiff.

Dr. Langmuir testified that he has benefited from the clinical analysis of the cases which was prepared by panel member Dr. Maurice Victor. However, Dr. Langmuir further testified that after studying the case printouts "for hours," Mr. Dennis Bregman and he devised a way to group the cases by "extent of motor involvement" rather than by the original classification of "degree of severity". Table 1 starts with 1,098 cases. Thirty-three cases are then excluded for the reasons given, and 121 under age 18 cases are set apart for sepa-

---

**22.** To obtain a relative risk of two, the ratio would have to be 1.16. To obtain a relative risk of three, it would have to be 1.74, etc.

**23.** These conclusions are not affected when the periods of January alone (2/4 = .50) or January through March (6/13 = .46) are also examined.

**24.** This conclusion is further illustrated by comparing the Michigan rate for "late onset" cases to its unvaccinated rate for the months of January-April 1977. During this 17-week period, Michigan reported 19 unvaccinated cases in its 18 and over population. Using four million as the number of unvaccinated persons, one obtains .28 cases/million person weeks (19 cases/17 weeks (of risk) × 4 million (at risk)) as the unvaccinated case rate in Michigan between January-April.

In Michigan six vaccinated cases had onsets occurring in the ninth through seventeenth weeks after vaccination. All six of these cases occurred between January and April, and all of the persons vaccinated in Michigan were studied out to the seventeenth week. Therefore, using 2.3 million as the number of persons vaccinated, one obtains .29 cases/million person weeks (6 cases/9 weeks (of risk) × 2.3 million (at risk)) as the "late onset" (ninth—seventeenth week after onset) rate in Michigan.

Since the two rates above are almost precisely identical, to get a relative risk of two for the late onset cases there would have to have been six more nine through seventeen week cases. To get a relative risk of three, there would have to have been twelve more nine through seventeen week cases.

rate analysis. Nine hundred forty-four cases remain. The cases are classified in tables 2 and 3 without respect to vaccination status.[25] Table 2, entitled "Clinical Evaluation and Classification by Extent of Motor Involvement," is set forth below:

| Group | Extent of Motor Involvement | Number of Cases |
|---|---|---|
| A. | Extensive: paresis or paralysis of extremities plus trunk and/or cranial muscles: | |
| | with respiratory impairment; | 303 |
| B. | without respiratory impairment; | 277 |
| C. | Limited: paresis or paralysis of only: | |
| | 3 to 4 extremities; | 173 |
| D. | 1 to 2 extremities | 69 |
| E. | Insufficient: the recorded data were either too limited in extent, or conflicting in character or simply recorded "unknown" thereby precluding any classification by extent of paralysis | 122 |
| | Total | 944 |

An understanding of the classification system is crucial because plaintiff and Dr. Goldfield argue that for purposes of a late-onset relative risk analysis, Dr. Langmuir's classifications introduce substantial bias.

Plaintiff challenges the reliability of Dr. Langmuir's classification analysis. He argues that Dr. Langmuir's placement of 122 CDC cases in the "insufficient" category biases the study against him.

Dr. Goldfield testified that a substantial number of late onset vaccinated cases were classified as insufficient and were therefore arbitrarily removed from the study. He feels that no reported cases should be eliminated from the study because: (1) all the cases reported to the CDC were initially accepted as GBS by the states; (2) based on the data provided, it cannot be said with certainty that the cases are not GBS; and (3) random error equally distributed among the vaccinated and unvaccinated cases is

better than arbitrarily removing cases (Dr. Langmuir's "insufficients").

In support of the classification analysis, Dr. Langmuir notes that while a "high proportion" of the first four groups, *i.e.,* extensive A (89.8%) and B (89.5%) and limited C (80.6%) and D (78.3%) were given a lumbar puncture, "less than half of the insufficient (47.5%) were given a lumbar puncture." Of the first four groups, "82%, 82.7, 75.7 and 81% had elevated protein of 50 milligrams or more without cells." Contrasted with these positive GBS diagnoses, "among the insufficient [there were] only 56%, 57% or 56.9%." Dr. Langmuir interpreted these lumbar puncture figures

> to suggest that a fair portion of the insufficient cases really weren't Guillain-Barre Syndrome, GBS, but they are included from some source, some states.

In his table 4, Dr. Langmuir separated each of the classification groups A–E into columns of vaccinated and unvaccinated. Such a separation process was "crucial" because

> one of the fears would be that a great deal more attention would be given in filling out the form and reporting the form on vaccinees than among unvaccinated cases.

> If so, that would have given us very major analytical problems ... Some of these, of course, the 100 percent is by definition, but the other categories there might well be considerably lower among the unvaccinated, all sorts of bias could have been introduced.

Based on the table, Dr. Langmuir determined that the reporting of data for both the unvaccinated and vaccinated cases showed "a surprising uniformity in all the characterizations that we've got." He elaborated:

> ... this is the first time that we look at the two groups that we're really going to

25. Dr. Langmuir was questioned on direct examination about the vaccination status of the cases categorized in tables 1–3:

Q. At the time that you began this process, did you give any regard to whether or not a case was a vaccinated case of GBS or an unvaccinated case?

A. We very carefully avoided this at considerable effort and time. We took the entire group ... And in the printouts that we made, we left off the vaccine status so that we couldn't even see it and we ignored it completely in our clinical classification.

compare, and we do it, as you go down, look at the characterization which is awfully important. They have the characteristics of GBS, progressive motor weakness and bilateral weakness. Lower motor neuron, reduced reflexes and in the first four groups, A, B, C and D you find no real difference.

Dr. Langmuir thus concluded:

This was most encouraging to us, that while we lost 12 percent of the data as insufficients, the data that was reported to us was indeed filled out well and consistently.

It doesn't necessarily mean that all the cases were reported, but of those that were reported to us, the vaccine did not influence the quality of the filling in the form. This is what we call calibrating our data. So that we can have some confidence that there aren't built-in biases that then come out later as though they were important.

Counsel for the plaintiff asked Dr. Langmuir a series of questions about the 64 vaccinated cases which, together with the 58 vaccinated cases, comprise the "E" group of "insufficient" cases. Relying on Dr. Langmuir's appendix Table B–2, counsel asked:

And we find for those 64 people, on the last line—under "findings unknown," E, that for each one of the line listings going across of the 64, 38 didn't answer questions about whether muscle area affected one or two areas. 36 of the 64 didn't answer a question about 3 to 4 extremities. 40 of the 64 didn't answer questions about the trunk. 43 of 64 didn't answer questions about the respiratory impairment. 34 of the 64 didn't answer questions about progressive motor weakness. 42 of the 64 didn't answer questions about lower motor neuron involvement. And 36 of the 64 didn't answer questions about diagnosis by a neurologist; is that correct?[26]

Dr. Langmuir affirmed. He was then asked:

Now, for all of those unknowns, the inability to review medical records doesn't allow us to fit them into the severe or limited category, is that correct? Or to exclude them, for that matter, from the diagnosis at all, is that fair?

Dr. Langmuir responded, "Your addition makes it a fair statement."

On direct examination, Dr. Langmuir, referring to the cases classified as "insufficient," stated that "the only way to find out is to get out the records and get the data." Asked whether the CDC "in fact [has] any underlying medical records which pertain to the 1,098 cases," he answered that he had not "directly see[n] any of the files at the CDC." While he stated that he was ready

---

**26.** Appendix Table B–2 (Vaccinated Cases) and Appendix Table B–3 (Unvaccinated Cases) tabulate "Numbers of Cases According to Muscle Areas Affected, Clinical Characterizations and Confirmation of Diagnosis by Extent of Motor Involvement" in each severity group (A, B, C, D and E). The table lists the total number of cases for the severity group and gives the number of cases of that total (subtotal) for each of nine diagnostic categories in which information is unknown.

Under the heading "Muscle Areas Affected," five diagnostic categories are listed. These included "1–2 Ext. (extremities), 3–4 Ext., Trunk, Cranial, and Resp. Imp. (respiratory impairment)." Under the heading "Characterizations" appear the categories "PMW (progressive motor weakness), BIL (bilateral), and LMN (lower motor neuron involvement)." Finally, under the heading "Confirmation" appears "Dx Neur (Diagnosis by a neurologist), Lumbar Done (lumbar puncture taken), and Punct. Pos.

(lumbar puncture results positive)." No case numbers are listed for the "Lumbar Done" and "Punct. Pos." categories. However, table 3 provides data that shows that only 33 cases of the 122 cases in Group E had positive "elevated protein" findings.

For the 64 vaccinated cases and 58 unvaccinated cases in Group E ("Insufficient"), the sub-totals of cases with missing information in the nine categories are: 64 vaccinated cases—38, 36, 40, 43, 32, 34, 42, 42, and 36; 58 unvaccinated cases—37, 36, 36, 34, 23, 30, 33, 31, and 31. The median number in the range of sub-totals of cases with unknown information among the nine categories is 38 (60%) for the 64 vaccinated cases and is 33 (57%) for the 58 unvaccinated cases. In each of the nine categories, information is lacking in 50% or more of the 64 vaccinated cases; and in eight of the nine categories, information is lacking in 50% or more of the 58 unvaccinated cases.

to travel to "pursue those 122 people by review of medical records or calling the physician," he accepted the "discovery of information specified." He stated that since he received "the same material that was made available to the Court and to [Dr.] Goldfield and to other people," he has not "tried to open up the locked door" and "[he has] no thought of doing it in the near future."

A national panel has been convened by the Department of Justice to carefully review in depth the CDC computer printout data involving the 1,098 "GBS" cases (originally the subject of Dr. Schonberger's study and Dr. Langmuir's Royal Medical Society lecture and article). Since the national panel will ultimately issue a report, it would appear that the report's usefulness would be enhanced if the Department were able to provide the panel with the "unknown" information concerning the 122 cases which have been classified as "insufficient" by Dr. Langmuir and the national panel. The removal of 12% of the cases from the adjusted total of 944 cases (already reduced from the original universe of 1,098 cases) is a substantial shrinkage of the body of research data. While it does not appear from the evidence that CDC has underlying medical records that would supply the "unknown" information, it does appear that the CDC can identify the persons in the 122 "insufficient" cases, and it may also have the names of the attending doctors. Through them the missing information may be securable.

However, for purposes of assessing Dr. Langmuir's case classifications, the court must take "as is" the case printout information of the 122 "insufficients." This is the data that was made available under Judge Gesell's fall 1981 order to both parties. Both doctors Goldfield and Langmuir are entitled to appraise the quality of the data.

While all 1,098 cases were reported to the CDC as GBS, there can be no certainty that the cases lacking critical information were in fact GBS. Indeed, Dr. Cole, an experienced and competent neurologist, was presented the underlying data for a number of the insufficient cases, and he was asked whether he could diagnose the cases as GBS. In several instances he testified that the data was "inconsistent" with GBS. In every other instance, he stated that he could not diagnose the case as GBS without additional information.

With more than 50% of the information missing in each of the nine diagnostic categories in the 122 cases (vaccinated and unvaccinated) and with only 33 of the 122 cases having positive "elevated protein" findings, it is concluded that Dr. Langmuir had a reasonable epidemiological basis to exclude the 122 "insufficient" cases from the cases he further analyzed.

Plaintiff additionally contends that Dr. Langmuir's division of the remainder of the cases into two groups (extensive and limited) introduces substantial error into his analysis, particularly as it affects his relative risk study.

Dr. Goldfield testified that since a substantial percentage of the cases classified by Dr. Langmuir as "limited" have their onsets in the later weeks, a separate examination of these cases lowers the relative risks obtained for the vaccinated population as a whole in the later weeks. Dr. Goldfield prepared at trial a table labeled "Langmuir's New Classifications, Limited Cases by Incubation Period." This table and Dr. Langmuir's table 7 both record nine "limited" and nine "extensive" cases in weeks 11 through 16, a 50–50 ratio. However, the nine "limited" cases represent seven percent of the 123 cases classified as "limited," while the nine "extensive" cases represent only three percent of the 321 cases classified as "extensive." Dr. Goldfield states that this pattern seems to parallel a pattern observed

> with rabies vaccine (in humans) and in animals. There appears to be a reciprocal involvement between the seriousness and the incubation period.

He then states:

> This pattern indicates that any attempt to analyze the risk based on the classification of cases is fraught with error. Because of this phenomenon, if you examine

the extensive cases only, you will under-estimate the relative risk in the later period. If the limited only are investigated, you will underestimate the relative risk early on.

To Dr. Langmuir, on the other hand, distinguishing limited motor involvement from extensive motor involvement was essential in the calibration of the data. Asked if "there is evidence of a relationship between the swine flu vaccine and Guillain-Barre Syndrome" with respect to the "extensive motor involvement cases," Dr. Langmuir testified:

> There is a very clear epidemiological, I wouldn't say clinical, but epidemiological relationship, indicating that sometime toward the end of the first week after vaccination, following through at least six weeks, there is a clear causal relationship, a clear temporal or relationship of such consistency and magnitude that I draw a conclusion of a causal relationship.

He thought it quite possible that "some of [the] cases in the seventh and eighth week also would have been caused by the vaccine," but he found "no evidence of a relationship after the ninth week." However, as to the limited group, he stated:

> There is very little evidence that the limited cases are related to the vaccine ... [As to these cases], I can't give you an opinion. We are at the limits of epidemiological studies.[27]

In figure 2 Dr. Langmuir line-graphs incidence rates of GBS among the vaccinated population in seven-day intervals by extent of motor involvement. Dr. Langmuir draws a curve on figure 2 which plots the cases classified "limited" as a relatively flat curve which reaches a high point of .5 cases

per million persons per week in about the third week. Dr. Langmuir testified:

> We have this phenomenon ["umpteen cases with only a minimum of paralysis in the first week"] and then if falls off, so we can't get any sense that there is an orderly curve. We can only conclude that the limited cases are a mixture of—I don't know how many different entities, some of which are probably swine flu induced disease. But there are other problems unresolved.

Figure 2 discloses that the "extensive" curve peaks in the third week at 2.5 cases per million persons per week and then rapidly drops off to about .75 around the fourth week. The curve continues to decline, although less precipitously, so that in the ninth week (at .25 cases per million persons per week) the "extensive" line drops below and thereafter stays below the "limited" curve. Referring to this last drop, counsel for the plaintiff asked Dr. Langmuir, "All right. And at the same time in the ninth week, the limited cases were above—the vaccinated limited cases were above these unvaccinated cases at a rate of two to one; isn't that right?" Dr. Langmuir answered:

> The limited cases, I have testified, I believe, is a great vegetable soup of many different diseases mixed together which I am totally unable to interpret.

The cross-examiner's last questions followed upon this statement:

Q. Didn't you tell me that we can't interpret the limited people?

A. You can. I can't.

Q. And the reason you can't is that you believe that the data that's provided by the limited people does not allow us to tell whether or not they are Guillain-Barre; isn't that right?

---

**27.** Dr. Goldfield argued that a much sharper epidemiological pattern appeared using the original classifications of Dr. Victor. Dr. Goldfield complained that when Dr. Langmuir reclassified Dr. Victor's mild cases as "limited," he arbitrarily removed 30 cases from the "mild limited" group. Of these 30 reclassified "mild" cases, however, the court has determined that Dr. Langmuir reclassified 22 of these "mild" cases as "extensive." Moreover, 21 of these 22

reclassified cases had an onset within the first 7 weeks after vaccination. Therefore, they can hardly be argued to have biased the case against plaintiff. The heart of the dispute really centers around Dr. Langmuir's reclassification as "insufficient" of 5 of Dr. Victor's "mild" cases with onsets between week's 11 through 16. As previously stated, this court does not find fault with Dr. Langmuir's use of the "insufficient" classification.

Dr. Langmuir answered, "In part that's it, yes."

Partly relying on Dr. Goldfield's testimony, but more directly relying on the appendix 9 category "positive findings" in the "limited cases," plaintiff's counsel offered the following chart in final argument:

| Group | No. Cases | 1–2 extrems. | 3–4 extrems. | PMW | BIL | LMN | NEUR |
|-------|-----------|--------------|--------------|-----|-----|-----|------|
| C | 93 | | 93 | 88 | 91 | 81 | 61 |
| D | 32 | 32 | | 31 | 32 | 29 | 20 |

Plaintiff argues that the limited cases manifest in nearly every instance the clinical symptoms of progressive motor weakness, bilateral neurologic signs, and lower motor neurologic signs. He also observes that approximately ⅔ of the limited cases were diagnosed as GBS by a neurologist.

It is true that Groups C and D of the "limited" classification contain proportionally high numbers of cases manifesting a number of the same clinical symptoms seen in the "extensive" cases. However, the chart omits any reference to the three categories of "trunk," "cranial," and "respiratory impairment." None of the "C" and "D" cases showed positive findings in these three categories which are deemed essential by Dr. Langmuir to classify a case as "extensive." Responding to counsel's questioning, which noted that the panel has "reclassified these cases into different categories now for the fourth time," Dr. Langmuir observed that these changes have occurred in "the process of calibration of the data." He added:

> As we study the data further we might very well be able to pull out of the limited cases a group that shows an epidemiological pattern that has significance.

Dr. Langmuir testified that "having made the separation, combining [all three groups] would merely cloud the picture and would not change any conclusion." But even if the limited and extensive cases were joined together, the enhanced relative risk plaintiff seeks to prove for the late weeks appears only when the plaintiff's post-December 18, 1976 unvaccinated base line (.11) is used. As previously concluded, the court does not find this to be a reliable base line.

Furthermore, based on his undisputed physical condition and diagnosis, it is determined that plaintiff Varga meets all the criteria for Dr. Langmuir's extensive group A, except respiratory impairment. Thus, he is properly classified as "extensive" group B. In further appraising Dr. Langmuir's classification analysis, it is determined that it is not unfair to compare Andrew Varga's GBS onset against the onset periods of other GBS cases classified as "extensive" A or B.[28] Indeed, if there is an enhanced risk of contracting an "extensive" case of GBS after a swine flu immunization, disregard of the "limited" cases should not affect plaintiff's case in any way. Therefore, this court finds unpersuasive plaintiff's attack on Dr. Langmuir's classification of the cases into separate study groups. The classification analysis is found to be reasonable, not arbitrary or biased.

## II.

Dr. Charles M. Poser was called by the plaintiff as an expert witness in neurology.[29]

28. The court believes that the most accurate epidemiological picture is drawn by looking at as specific a group as possible. Therefore, it is epidemiologically sound to compare plaintiff against other "extensive" cases.

29. In July 1981 Dr. Charles M. Poser resigned his position as Chief Neurologist, Department of Neurology, Medical Center Hospital, Vermont, and he assumed a position as a professor of neurology at Boston University School of Medicine. After obtaining a B.S. degree and an M.D. degree and completing a mixed intern-ship, he became a resident in neurology at the Neurological Institute, New York Presbyterian Hospital (1952–1955). He was Board certified in neurology and in 1969 he was Board certified in child neurology. After serving at different hospitals as a neurologist, he became professor and chairman of the Department of Neurology, University of Vermont College of Medicine, Burlington, Vermont in 1968. He held this position until he assumed his neurology professorship at Boston University School of Medicine. At the time of trial, he had 178 papers accepted. His most recent paper is entitled,

Dr. Poser reviewed the medical records of Andrew Varga, and agreed that his symptoms fit the criteria of GBS. It was his opinion that Mr. Varga's onset of GBS was on the 16th or 17th of February 1977. When asked whether he had an opinion with reasonable medical certainty as to the cause of the onset, he answered, "My professional opinion is that the GBS was caused by the swine flu vaccination."

As a basis for his opinion that Mr. Varga's onset of GBS was causally related to the swine flu vaccination, Dr. Poser offered the theory that when one receives a swine flue shot, the body's immune system produces antibodies which respond to the antigenic insult of the vaccine. In his view, production of the antibodies in plaintiff did one of two things: (1) it sensitized the immune system so that the subsequent introduction of an antigen similar to that in the vaccine gave rise to an abnormally high anamnestic immunologic response; [30] or (2) it resulted in a sub-clinical case of GBS which became acute following an anamnestic response to the subsequent introduction of an antigen similar to that causing the initial reaction.

Dr. Poser saw plaintiff's upper respiratory infection (URI) in February as the "trigger" for an anamnestic reaction causing GBS. In his opinion, the initial production of antibodies resulting from the swine flu immunization caused plaintiff's immune system to overreact to one or more of the antigens present during plaintiff's February URI. Thus, Dr. Poser believed that the vaccination set the stage for plaintiff's immune system to later "go awry," resulting in GBS.

Dr. Poser makes it clear that without the upper respiratory infection which Mr. Varga suffered in early February, he "certainly would not be able to offer an opinion of a relationship between the swine flu vaccination and his GBS."

The article, "Late Onset of Guillain-Barre Syndrome," jointly authored by Dr. Poser and Dr. Peter O. Behan, (hereafter Behan-Poser article) *supra*, n. 29, provides a substantially similar explanation for Dr. Poser's opinion in this case. The article states:

> It is postulated that certain individuals are already sensitized to a variety of viruses and the effect of, for instance vaccination, is to trigger an anamnestic response to certain antigens with the appearance of acute, clinical GBS after a variable interval.

*Id.* at 37.

Dr. Poser agrees that his opinion is a "hypothesis." Dr. Poser concedes that as late as the year 1979 he held the opinion that a GBS case following swine flu vaccination could have an incubation period of "six weeks at most." However, he says that he no longer held this opinion after he became acquainted with the Schonberger study.[31]

The United States called several neurologists, all of whom disagreed with the opinions of Dr. Poser. Dr. Charles Brausch, a clinical neurologist who practices primarily on the west side of Cleveland, examined Andrew Varga at Lutheran Medical Center in February 1977 as a consulting neurolo-

"Late Onset of Guillain-Barre Syndrome," *Journal of Neuroimmunology* 3 (1982) 27–41."

**30.** According to Dr. Randall Krakauer:
An anamnestic response is a response that is exacerbated in degree and usually occurs in a shorter period of time as a result of an organism's prior experience with that antigen. That is, the first experience with an antigen primes an organism for a more—for a quicker and more intense response later.

**31.** In its abstract, the Schonberger study states: The period of increased risk was concentrated primarily within the five-week period after vaccination, although it lasted for approximately nine or ten weeks.
Dr. Poser testified that he believed that an enhanced risk extended to the twelfth week. However, the Schonberger article states:
The peak relative risk, which exceeded 12, occurred in weeks two and three after vaccination, and prior to the tenth week after vaccination all relative risks were significantly greater than one, p<.05. From the tenth week on, the relative risks no longer remained significantly different from one.

gist. He diagnosed Mr. Varga's condition as GBS with cranial nerve involvement.[32]

It was Dr. Brausch's impression that Mr. Varga's antecedent upper respiratory infection earlier in February was the most likely antecedent event that led to his GBS. As for the swine flu vaccination, he said "I do not believe it was related." He said he believed the interval "was too long." Dr. Brausch has treated 100 to 150 GBS cases in 17 years. He has also lectured on GBS. As a clinical neurologist, he stated that he did not accept the concept in the Poser-Behan article of nascent hypersensitivity of the immune system.

Dr. Donald C. Mann is a practicing neurologist in the Cleveland area. He is an assistant clinical professor of neurology at Case Western Reserve University School of Medicine. He states that since his graduation in 1968 from medical school and his completion of two years of neurologic training in the Army, 40 or 50 persons suffering from GBS have been under his care. In about two-thirds of his GBS patients, Dr. Mann states that there was an antecedent flu-like illness or gastrointestinal involvement. The onset of GBS was usually within three to five days after the illness, but it sometimes occurred up to six weeks later.

Dr. Mann examined all of the medical records relating to Andrew Varga. It was his opinion that the most likely cause of the GBS Mr. Varga contracted in February was the flu he experienced in early February. As support he stated that Mr. Varga "had clear-cut flu-like illness." He recovered from that a week or two later when the GBS occurred. That is just the kind of time relationship prior to GBS that one expects.

He agreed that he interpreted Mr. Varga's cold in early February to be flu.

The United States also called as an expert neurologist witness Dr. Monroe Cole, a neurologist who practices in the Cleveland area. Board certified, Dr. Cole has served as assistant or associate professor of neurology in several medical schools including Case Western Reserve University School of Medicine. He is the author of more than 30 papers relating to neurology.

It was Dr. Cole's opinion that there was no relation between Mr. Varga's GBS illness which had an onset on or about February 17, 1977 and his October 31, 1976 swine flu inoculation. As a reason, he stated that his "acceptance of new epidemiological data and experimental data all indicate that the time was too prolonged to incriminate the injection." He further believed that Mr. Varga's upper respiratory infection in early February was the most likely cause of the event because it was closest to his GBS illness. With reference to the opinions expressed by Dr. Poser in the Poser-Behan article, he expressed the opinion that these opinions present "a speculation which does not even reach the level of a hypothesis because Dr. Poser does not set up a means to test it and no data to support his speculation."

Plaintiff did not offer the testimony of any immunologist, but Dr. Poser referred to immunologic principles. The defendant called Dr. Randall S. Krakauer, an acknowledged immunologist.[33] Dr. Krakauer explained that the science of immunology is the study of the body's ability or any organism's ability, for that matter, to maintain an internal environment free of

32. Dr. Brausch testified that the "active surveillance system ended January 31, 1977." He did not recall whether he reported any cases during that time. The onset of Mr. Varga's case was February 16 or February 17, 1977. He did not report Mr. Varga's case to the CDC.

33. Dr. Krakauer received both his B.S. and M.D. degrees in 1972 after completing a combined five-year undergraduate and graduate program at Rensselaer Polytechnic Institute, Troy, New York and Albany Medical College, Albany, New York. After completing his residency in medicine in 1974, Dr. Krakauer worked as a clinical associate for the National Cancer Institute, N.I.H., until 1976. After serving as a fellow in rheumatology at Massachusetts General Hospital and Harvard Medical School, Dr. Krakauer joined the Cleveland Clinic in 1977. He is currently the head of the section of clinical immunology at the Cleveland Clinic and serves as an associate professor at Case Western Reserve University. He has published 58 articles.

foreign material. That is, the ability to recognize what is foreign and eliminate it and the ability to recognize what is self and leave it alone.

Both Dr. Krakauer and plaintiff's neurologic expert, Dr. Poser, agreed that GBS is an auto-immune reaction against the peripheral nerve myelin (the nerve covering). Thus, GBS occurs when the immune system attacks the body's own peripheral nerve myelin while responding to an antigenic insult.[34] In the Behan-Poser article, *supra,* the authors state and Dr. Poser adopts the opinion:

It is postulated that that same basic process [a vasculomyelinopathy] causes GBS rather than cell-mediated hypersensitivity to myelin. The idea, that lymphocytes sensitized specifically to myelin antigens develop rapidly after each of the various noxae implicated, is not readily acceptable. It seems more likely also that breakdown of myelin by macrophages is caused by humoral factors than T lymphocytes.

Generally on the same subject, Dr. Krakauer distinguished a cell-mediated response from a humoral response. A cell-mediated reaction is an immune reaction in which

cells at a particular site may proliferate, release pheochromocytic cells of inflammation, collect macrophages at the site, and literally gobble up the tissue and get rid of it.[35]

A humoral response, he said,

is one that is mediated by antibodies which are proteins, which have the ability to themselves recognize antigens, either self or foreign, and damage them or initiate damage in their own rate.

Asked whether either a cell-mediated response, or a humoral response, or both, may cause Guillain-Barre Syndrome, Dr. Krakauer responded:

My opinion would be that perhaps the humoral immunity is playing a larger role than cellular, but that is—I would not care to state that as a conclusion.

Further asked, "Is that because at this point, Doctor, as a clinical immunologist, you just don't possibly know?" He answered, "That is correct." Thus, Dr. Krakauer is unsure about Dr. Poser's theory that "humoral factors" cause the "breakdown of myelin."

Moreover, Dr. Krakauer disagreed with Dr. Poser's "sensitization" and "sub-clinical" theories. He stated that GBS results when the body mounts an immunologic response against its own peripheral nerve myelin in the process of reacting to a viral (or another type of) antigen. Dr. Krakauer believes that the auto-immune response occurs simultaneously with the body's reaction to a given antigen so that the GBS has its onset during the peak phase of the immune system's response to the antigenic insult. Thus, GBS either results during an immunologic response or it does not. Dr. Krakauer sees the concept of anamnestic response as having no relevance to GBS.[36] To Dr. Krakauer, the swine flu vaccination in October and the URI in February were two separate and distinct antigenic insults. Since the plaintiff's GBS onset occurred during the peak phase of his immunologic response to the February 1977 URI, plain-

---

**34.** In the words of Dr. Krakauer, "antigens are chemicals, usually proteins or other large, more relatively complex molecules, that comprise the body or foreign materials which may enter the body."

**35.** Dr. Krakauer thus described macrophages:

A macrophage is a cell or—it is called a pheochromocytic cell, which can engulf, ingest and eliminate material from the body.

So, for example, as an example, some foreign material which has been identified and coated by an antibody may then be engulfed by a macrophage which then will carry it through the blood elsewhere and get rid of it.

Dr. Krakauer was asked by counsel, "Are these what are known as clean-up cells or garbage collectors?" He responded, "Yes. They are garbage collectors."

**36.** Dr. Krakauer stated:

With respect to the anamnestic response idea, this does not appear to be the case in Guillain-Barre syndrome. Were this to happen the people immunized would be at substantially increased risk for practical purposes forever, and this certainly—and this has—no one has ever claimed this to be the case.

tiff's GBS resulted from his immune system confusing his indigenous nerve myelin with antigens produced during the URI.

Dr. Poser admitted that he has never conducted any studies to support his hypothesis. However, he noted his citation of several experiments and studies tending to support it. He added that he was "not sure you could ever prove it, except by experimental methods with animals."

Dr. Krakauer testified that in all animal studies involving EAN, the animal model for GBS, the amount of time in which the auto-immune reaction occurs "falls into certain predictable parameters" which do not approach 16 weeks. He stated that in EAE, the animal model for multiple sclerosis, "you can get detectable pathology which does occur before 16 weeks without symptoms for some longer period of time." However, Dr. Krakauer observed that unlike GBS, "multiple sclerosis is not an acute disease," and is "characterized by exacerbation and remissions over years." Therefore, he saw "very little" relevance "between the animal model of EAE and the human Guillain-Barre syndrome."

The court must make its decision based on the present state of neurologic and immunologic knowledge. Weighing the testimony of the neurologists and immunologist Krakauer and the related evidence, the court is unable to accept Dr. Poser's hypothesis of delayed onset GBS. Therefore, the court is unable to credit Dr. Poser's opinion that Mr. Varga's GBS is causally related to his swine flu inoculation. The evidence indicates that the likely cause of Mr. Varga's GBS syndrome was the upper respiratory illness which Mr. Varga suffered in early February 1977.

### III.

Having considered the epidemiologic, neurologic and immunologic evidence and the other evidence in the record, the court, concludes, upon the grounds set forth above and for the reasons stated, that the plaintiff Andrew Varga has not proved by a preponderance of all the evidence that his case of GBS was caused by his swine flu inoculation. Therefore, judgment is entered against the plaintiff and for the government.

IT IS SO ORDERED.